IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WANDA VERRET, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:03-cv-1231 MEF |
| | ) | |
| STATE OF ALABAMA DEPARTMENT | ) | (WO - Recommended for Publication) |
| OF MENTAL HEALTH, *et al.*, | ) | |
| | ) | |
| DEFENDANTS | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Plaintiff Wanda Verret ("Plaintiff") brought this action as Administratrix of the estate of her son, Ronald Corkerin ("Corkerin"), and in her individual capacity, against the State of Alabama Department of Mental Health and Mental Retardation, the Commissioner of the Department, and numerous employees, alleging that the actions and inactions of the defendants resulted in the wrongful death of her son, Ronald Corkerin, a patient of the Thomasville Mental Health Rehabilitation Center ("the Center"). Most of the original defendants have been dismissed from this case; the remaining defendants are two members of the Center's staff, Rhonda Cade Waters ("Waters") and Zerick Pritchett ("Pritchett"). Plaintiff asserts claims under 42 U.S.C. § 1983 for violation of Corkerin's constitutional rights guaranteed by the Fourteenth Amendment and under Alabama law for various torts. This cause is before the Court on Motions for Summary Judgment filed by all of the

1

remaining parties to this case.  The Court has reviewed the submissions of the parties and carefully considered the arguments in support of and in opposition to the Motion.  For the reasons stated herein, Plaintiff's Motion is due to be DENIED, Pritchett's Motion is due to be DENIED, and Waters' Motion is due to be GRANTED IN PART and DENIED IN PART.

## II.  JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 1367 (supplemental jurisdiction).  The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations in support of both.

## III.  STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment is to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.   An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir. 1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in

2

its favor." *Chapman v. AI Transp.,* 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir. 1995) (internal quotation marks and citations omitted)).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the nonmovant and must draw all justifiable inferences from the evidence in the nonmoving party's favor. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986);

*McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (the evidence and all reasonable inferences from the evidence must be viewed in the light most favorable to the nonmovant).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

## IV.  FACTS AND PROCEDURAL HISTORY

At the time of his death on November 27, 2001, Corkerin was a patient at the Center in Thomasville, Alabama.  From the time he was nine years old until his death, Corkerin was a patient in various Department of Mental Health and Mental Retardation ("DMHMR") facilities.

DMHMR employed Waters as a "Registered Nurse II"[1] at the Center.  Waters' duties as a nurse included nursing assessments of the patients, administering medication, implementing doctors' orders, and providing information to the medical staff about the patients.  At the time of Corkerin's death, Waters was on duty.

DMHMR also employed Pritchett.  His position at the Center was "Mental Health Worker I."[2]  Pritchett's duties as a Mental Health Worker were essentially to obey orders and

---

[1]  There are multiple levels of Registered Nurses at the Center, with Registered Nurse II being a superior position to Registered Nurse I.

[2]  There are three levels of Mental Health Workers, designated by I, II, and III. Mental Health Worker I is the lowest level and must obey the orders of a Mental Health Worker II or III.  Registered Nurses also supervise all levels of Mental Health Workers.

do as directed.  Like Waters, Pritchett was on duty at the time of Corkerin's death.

On the morning of November 27, 2001, at approximately 10:15 a.m., a unit nurse took Corkerin to the clinic at the Center because he had complained that he had injured his back. Dr. Daveta Dozier took an x-ray of his back and prescribed medication for pain and for muscle spasms.  Dr. Dozier also ordered Corkerin to get bed rest and to keep ice on his lower back.

Both Waters and Pritchett began their shifts that day at approximately 6:00 p.m. When Waters arrived, Corkerin was lying on the floor of the visiting room area.  Corkerin complained to her that his back hurt and that he had chest pain with difficulty breathing.  At approximately 6:40 p.m., Waters notified Dr. Dozier about Corkerin's complaints.  Dr. Dozier ordered Waters to administer Maalox and to keep Corkerin's head elevated to prevent indigestion possibly caused by the pain medication.  After about 15 minutes, Pritchett accompanied Corkerin to the bathroom.  Corkerin then went to his bedroom.

At approximately 8:00 p.m., a Mental Health Worker called Waters and requested that she come to the Unit where Corkerin's bedroom was located.  When she arrived, Waters learned that Corkerin had told the staff that he had fallen, but that none of the staff had actually seen the fall.  Waters took Corkerin's vital signs and asked if he had fallen.  Corkerin said he was "hurting" and that he had fallen out of bed.  Corkerin also complained of stomach pain.  At this time, Waters did not observe any discoloration, redness, bruising, swelling, or marks on Corkerin's head or body.

5

At approximately 8:15 p.m., Waters called Dr. Dozier and informed her that Corkerin said he had fallen out of bed and that he was complaining of stomach pain.  Waters informed Dr. Dozier that Corkerin had no evidence of injury.  Dr. Dozier ordered that the pain medication be discontinued because it may have caused stomach irritation.  Dr. Dozier further ordered that the Maalox be continued as needed, and that Corkerin be placed on "medical observation."

Because of its proximity to the nurse's station, Waters asked Corkerin to lie down in the seclusion room rather than his bedroom.  However, Corkerin wanted to stay in his bedroom.  Waters told Pritchett to move Corkerin's mattress to the floor so that he could not accidently fall off the bed.  Pursuant to the doctor's order for medical observation, Waters also instructed Pritchett to watch Corkerin.  Pritchett placed a chair at the doorway to Corkerin's bedroom and began the observation.  Waters then filled out a form indicating that Corkerin was on "constant observation."

Shortly thereafter, another patient complained to Waters that he needed to go to the laundry room.  Waters ordered Pritchett to escort the patient to the laundry room, and told him that she would continue the observation while he was gone.  While Waters was conducting the observation of Corkerin, a patient approached her and asked for his medicine right away.  Waters took the patient to the nurse's aide station in order to provide the medicine.  During this period of time, there was no one observing Corkerin.  Before Waters was finished getting the medication, Pritchett returned from the laundry room and resumed

his post observing Corkerin.  Pritchett made the following note in the observation log for 8:45 p.m.: "Client has continued to move about on mattress repositioning himself but not yelling out in pain.  Noted mumbling at times."

Within a short period of time, Waters told Pritchett to ask Corkerin if he could come to the nurse's station to get his medication, or if he needed her to bring it to him.  Pritchett called for Waters to come to Corkerin's room because he was not moving.  Waters ran to Corkerin's room and examined him.  Corkerin was not breathing and did not have a pulse. Waters ran to the nurse's station to report that a patient had "coded" (meaning that the patient was in cardiac and/or respiratory arrest).  When Waters returned to Corkerin's room, other nursing staff were administering CPR.  Corkerin was taken by ambulance to a hospital where he was pronounced dead at 9:55 p.m.

Dr. Kathleen Enstice performed an autopsy on Corkerin on November 28, 2001.  Dr. Enstice was the State Medical Examiner for the Alabama Department of Forensic Sciences. The autopsy found evidence that Corkerin had sustained various injuries,[3] and Dr. Enstice

---

[3]  The Final Diagnoses of the autopsy was as follows:

    I.      Asphyxia associated with compression of neck.

          A.      Bilateral common carotid artery sheath hemorrhages.

          B.      Petechiae of conjunctivae, sphenoidal sinus mucosa, mucosa of epiglottis, larynx, and trachea; epicardial surfaces of heart, thymus, visceral and parietal pleura of lungs, gastrointestinal serosal surfaces and adjacent fatty tissue and mesenteries.

    II.     Blunt force injuries.

concluded that the cause of death was "asphyxia due to compression of neck and blunt force injuries of abdomen" and that the manner of death was "homicide."

The State of Alabama has tried Pritchett for the murder of Corkerin two times.  The first trial began on October 27, 2003, and the second began on December 4, 2006.  Both trials resulted in a mistrial due to a hung jury.  At these trials, Dr. Enstice testified that there was no indication that any of the injuries revealed by the autopsy were self-inflicted, or that they were caused by falling off a bed, overdose of drugs, a heart condition, or by the administration of CPR.  Dr. Enstice further testified that Corkerin's injuries were consistent with injuries that would be sustained if he had been placed in a "carotid sleeper hold."

This case was originally filed on November 15, 2002, in the Montgomery County Circuit Court.  On November 20, 2003, Plaintiff amended the complaint to include a claim under 42 U.S.C. § 1983 for violation of Corkerin's Fourteenth Amendment rights under color

---

A.   Prominent hemorrhage of falciform ligament and subcapsular surfaces of liver, serosal surfaces of gallbladder and duodenum, head of pancreas, esophageal serosa, and right hemidiaphragm.

B.   Contusions of tongue and lower lip.

C.   Abrasion, buccal mucosa of lower lip.

D.   Abrasions, skin of midline back.

**CAUSE OF DEATH:**   Asphyxia due to compression of neck and blunt force injuries of abdomen.

**MANNER OF DEATH:**   Homicide

of state law.  On December 17, 2003, the case was timely removed to this Court on the basis of federal question jurisdiction.  On December 22, 2005, this Court granted a continuance of the case pending the outcome of Pritchett's criminal trial for the murder of Corkerin.  On January 18, 2007, after the criminal trial resulted in a mistrial, this Court entered a Scheduling Order setting the trial for this action for November 5, 2007.  Currently, the only defendants remaining in this case are Waters and Pritchett.  Plaintiff and both defendants have filed motions for summary judgment, which are now before this Court.

## V.  DISCUSSION

### A.    Section 1983

Plaintiff's federal claims against Waters and Pritchett are brought pursuant to 42 U.S.C. § 1983.  Section 1983 provides a cause of action against a person who, acting under color of state law, deprives someone of a right, privilege, or immunity secured by the Constitution and laws of the United States.  *See* 42 U.S.C. § 1983;[4] *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) ("§ 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.") (internal quotation

---

[4]  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law [or] suit in equity . . . .

9

marks omitted); *Cummings v. DeKalb County*, 24 F.3d 1349, 1355 (11th Cir. 1994).  Count XVIII of the Complaint seeks damages under § 1983 for violations of Corkerin's rights guaranteed by the Fourteenth Amendment of the United States Constitution.

### 1.    Rhonda Cade Waters

Waters argues that she is entitled to summary judgment on the § 1983 claim against her because of the affirmative defense of qualified immunity.  "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The analysis for qualified immunity follows a three-step process.  In the first step, the burden is on the defendant to show that he was performing a "discretionary function" at the time the alleged violation of federal law occurred.  *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).  Once the defendant has satisfied this test, the burden shifts to the plaintiff to demonstrate: (1) that the defendant has committed a constitutional violation; and (2) that the constitutional right at issue was "clearly established" at the time the violation occurred.  *Id.*

### a.    Discretionary Function

Waters claims she is entitled to qualified immunity because she was performing a discretionary function at all relevant times.  Specifically, she contends that her duties as a nurse inherently involve the exercise of judgment and discretion. Plaintiff argues that Waters

10

was not engaged in a discretionary function because the Center's policy 20-16 gave her no discretion to leave Corkerin unattended.[5]

Historically,  a "discretionary function" was defined as an activity requiring the exercise of independent judgment, and was distinguished from a "ministerial task." *See, e.g.*, *Williams v. Wood*, 612 F.2d 982, 984-85 (5th Cir. 1980).[6]  In the qualified immunity context, the Eleventh Circuit has abandoned this approach by interpreting "discretionary authority" to include actions that do not involve an element of choice.  *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1265 (11th Cir. 2004).  Indeed, *Holloman* makes it clear that "for purposes of qualified immunity, a governmental actor engaged in purely ministerial activities can nevertheless be performing a discretionary function."  *Id.*

The "discretionary function" analysis therefore does not focus on whether the act involved the exercise of actual discretion; rather, the inquiry is whether the act fell within the employee's job responsibilities.  *Id.*  The Eleventh Circuit has articulated a two-part test: (1) whether the employee was performing a legitimate job-related function or pursuing a job-

---

[5]  The Center's Policy 20-16(II)(2)(a) states:

> Constant observation is the assignment of one staff person exclusively to monitor and supervise one client.  Unlike one-to-one observation, however, with constant observation the staff member does not have to be at "arm's length" from the client, but must maintain the client within his/her sight at all times.

[6]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

related goal, (2) through means that were within his power to utilize.  *Id.*; *see also Hill v.*

*Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1185 (11th Cir. 1994) ("A government official

acts within his or her discretionary authority if objective circumstances compel the

conclusion that challenged actions occurred in the performance of the official's duties and

within the scope of this authority.").  Moreover, the circuit has elaborated that:

> [T]he inquiry is not whether it was within the defendant's
> authority to commit the allegedly illegal act.  Framed that way,
> the inquiry is no more than an untenable tautology.  In applying
> each prong of this test, we look to the general nature of the
> defendant's action, temporarily putting aside the fact that it may
> have been committed for an unconstitutional purpose, in an
> unconstitutional manner, to an unconstitutional extent, or under
> constitutionally inappropriate circumstances.

*Holloman*, 370 F.3d at 1265 (internal quotation marks omitted).

Consequently, the discretionary function analysis presents the classic "level of

generality" problem, where the outcome of the analysis depends entirely upon the level of

generality at which the inquiry is conducted.  For the purposes of this analysis, a court must

examine the defendant's actions at the lowest possible level of generality necessary to

remove the constitutional taint.  *Holloman*, 370 F.3d at 1266.  In *Sims v. Metropolitan Dade*

*County*, 972 F.2d 1230 (11th Cir. 1992), the court concluded that a government official who

allegedly disciplined an employee for an improper reason was performing a discretionary

function because it was within the official's discretionary authority to administer disciplinary

measures.  *Id.* at 1236.  In *Holloman*, the court concluded that a government-employed

teacher who allegedly chastised a student in violation of his constitutional rights was

performing a discretionary function because it was within his discretionary authority to maintain decorum in the classroom.  *Holloman*, 370 F.3d at 1267.

However, this case presents a slightly different issue than was presented in either *Sims* or *Holloman*.  In both of those cases, the government official was performing a function that, on its face, the official was authorized to do.  Based on the evidence that has been presented to this Court, it does not appear that the specific action—leaving a patient under "Constant Observation" unattended—was technically within Waters' authority to do.  This is because the plain text of the Center's policy 20-16 does not leave any room for discretion: "the staff member . . . must maintain the client within his/her sight at all times."  Importantly, absent policy 20-16, there would be little room for dispute that Waters would have been engaged in a discretionary function under the qualified immunity analysis, *see Kyle K. v. Chapman*, 208 F.3d 940, 943 (11th Cir. 2000) (granting qualified immunity to direct care workers at a mental health facility "whose primary responsibility is carrying out the directions of the officials who determine patient care"), and Plaintiff bases her "ministerial act" argument entirely on the violation of policy 20-16.  Therefore, this Court must decide whether Waters' breach of policy 20-16 forfeits her right to qualified immunity.

In *Davis v. Scherer*, 468 U.S. 183 (1984), the Supreme Court rejected this precise argument.  *See also Harbert Int'l v. James*, 157 F.3d 1271, 1285-86 (11th Cir. 1998) (applying *Davis* to hold that violation of state statute or regulation which created a property interest did not forfeit defendant's right to qualified immunity for alleged violation of

procedural due process claim).   In *Davis*, a Florida Highway Patrol employee sued the

Florida Department of Highway Safety and Motor Vehicles under § 1983 for violations of

the Fourteenth Amendment for discharging him without providing him with procedural due

process.   *Id.* at 185-86.   The employee argued that the officials had forfeited qualified

immunity because, in discharging him, they had violated certain personnel regulations of the

Florida Highway Patrol.   *Id.* at 188, 193.   The Supreme Court held that violation of a statute

or regulation does not forfeit an official's immunity unless the violation itself gives rise to

the cause of action.   *Id.* at 194 & n.12.   The Court could not have expressed itself more

clearly: "Neither federal nor state officials lose their immunity by violating the clear

command of a statute or regulation—of federal or of state law—unless that statute or

regulation provides the basis for the cause of action sued upon."   *Id.* at 194 n.12.   The Court

noted that this rule applies even in situations where the regulation removes all discretion

from the official. *Id.* at 196 n.14 ("Even if the personnel regulation did create a ministerial

duty, appellee makes no claim that he is entitled to damages simply because the regulation

was violated.").   The Court explained why it refused to reach the opposite conclusion:

> [Under the alternative view], officials would be liable in an
> indeterminate amount for violation of any constitutional
> right—one that was not clearly defined or perhaps not even
> foreshadowed at the time of the alleged violation—merely
> because their official conduct also violated some statute or
> regulation. And, in § 1983 suits, the issue whether an official
> enjoyed qualified immunity then might depend upon the
> meaning or purpose of a state administrative regulation,
> questions that federal judges often may be unable to resolve on
> summary judgment.

14

*Id.* at 195.  Here, there is no claim by Plaintiff that policy 20-16 creates a cause of action for damages or provides the basis for an action brought under § 1983.  Consequently, this Court will follow the binding precedent established by *Davis* and hold that Waters' violation of policy 20-16 does not forfeit her right to qualified immunity.

> ### b.    Constitutional Violation

Once the defendant has established she was engaged in a discretionary function, the burden shifts to the plaintiff to demonstrate that the defendant's actions constitute a constitutional violation.   *Crosby*, 394 F.3d at 1332.  If the court concludes as a matter of law that the defendant's actions did not violate the Constitution, that ends the inquiry and the claim must be dismissed. *See Powell v. Barrett*, __ F.3d __, 2007 WL 2386610, at *15 (11th Cir. Aug. 23, 2007).

Plaintiff does not allege that Waters had any direct involvement in the death of Corkerin.  Rather, she argues that by failing to maintain constant observation of Corkerin, Waters failed to provide Corkerin with adequate protection from harm in violation of Corkerin's Due Process rights guaranteed by the Fourteenth Amendment.

An involuntarily committed patient in a mental health institution has a liberty interest in safety.  *Youngberg v. Romeo*, 457 U.S. 307, 319 (1982).  This right is violated if a government official fails to provide the patient with adequate protection from harm. *Dolihite v. Maughon*, 74 F.3d 1027, 1042 (11th Cir. 1996).  Unlike the prison context, which is governed by the Eighth Amendment and is violated by "deliberate indifference to a

15

prisoner's serious medical needs," an involuntarily civilly committed patient's rights are governed by the Fourteenth Amendment, which requires a higher standard of care than criminals whose conditions of confinement are designed to punish. *Dolihite*, 74 F.3d at 1041. Moreover, the Supreme Court in *Youngberg* established the "professional judgment" standard of care for mental health patients:

> [T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised.   It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.

*Youngberg*, 457 U.S. at 321.  However, binding precedent has further established that mere negligence does not rise to the level of a violation of the Fourteenth Amendment. *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990) (citing *Davidson v. Cannon*, 474 U.S. 344 (1986)).

Based on the evidence that has been presented to this Court, Waters' decision to leave Corkerin unattended was *at most* simple negligence.  Therefore, Waters' conduct was not a violation of the Fourteenth Amendment and she is entitled to summary judgment on the § 1983 claim.  The evidence presented to this Court is that after Waters assigned Pritchett to Close Observation of Corkerin, Frankie Hopkins ("Hopkins")—another patient at the Center—became very upset because he needed to go to the laundry room.  Waters determined that Hopkins was "escalating," so she determined that Pritchett would escort him to the laundry room, and she would continue the observation of Corkerin until Pritchett returned. While Pritchett was away, however, another patient approached her and demanded his

16

medication immediately. Because Waters could not provide medication to the patient without leaving the doorway to Corkerin's room, she asked the patient to wait until Pritchett returned from the laundry room. However, the patient threatened that if he didn't get his medication immediately, he wouldn't take it at all. Waters decided to walk to the nurse's aide station to give the patient his medication. From the aide station, Waters was still within eyesight of the doorway to Corkerin's room, but not in eyesight of Corkerin himself. Before Waters finished giving the patient their medication, Pritchett returned from the laundry room and continued the observation.

The fact that Waters' conduct may have amounted to a technical violation of a hospital regulation does not mean her conduct amounts to a violation of the Constitution. When a patient approached Waters during her observation of Corkerin, demanding medication and threatening to not take their medicine at all, Waters was faced with a difficult decision that had to be made on the spot. No evidence has been presented to this Court that indicates Waters' conduct meets the level of culpability required to violate the Fourteenth Amendment. Furthermore, other courts have refused to find constitutional violations in similar circumstances where patients requiring close supervision have sustained injuries while not being closely monitored. *See Shaw v. Strackhouse*, 920 F.2d 1135, 1143 (3d Cir. 1990). Consequently, Plaintiff has failed to meet her burden to demonstrate that a constitutional violation occurred, and this Court will dismiss the § 1983 claim against Waters on the grounds of qualified immunity.

17

2.      **Zerick Pritchett**

a.      **Pritchett's Argument in Support of Summary Judgment**

While Pritchett raised the defense of qualified immunity in his motion to dismiss filed on December 17, 2003, he does not raise qualified immunity in his motion for summary judgment.  Therefore, this Court will not address his potential qualified immunity defense at this time.[7]  Pritchett's motion for summary judgment appears to be based on the ground that Count XVIII of the Complaint, the count setting forth the § 1983 cause of action, failed to state a claim against him.  In support of his motion, Pritchett points to several paragraphs in Count XVIII that allege liability on the basis of "customs, policies, practices, or official acts," the failure to "develop, implement or administer procedures and policies," and "aware[ness] . . . of the history of widespread abuse at the facility and at other Department facilities."  Pritchett argues that the plaintiff has not put forth any evidence that he had any involvement in the implementation of the Center's policies, or that he was aware of any widespread abuse at the Center or any other facility.

This Court agrees with Pritchett's analysis of the evidence, however this does not

---

[7]  Even if Pritchett had raised qualified immunity in his motion, the result would be the same. There is a genuine issue of material fact with regard to the cause of Corkerin's death.  There is sufficient evidence for a reasonable trier of fact to conclude by a preponderance of the evidence that Pritchett assaulted Corkerin.  Were the trier of fact to so conclude, Pritchett would have violated a clearly established constitutional right of which a reasonable person would have known. *Kyle K. v. Chapman*, 208 F.3d 940, 943-44 (11th Cir. 2000) (physical or mental abuse of a patient in a mental hospital is a violation of a clearly established constitutional right).

mean that he is entitled to summary judgment. Plaintiff does not claim that Pritchett is liable under § 1983 for designing and implementing unconstitutional policies and procedures at the Center. Given Pritchett's status as a "Mental Health Worker I," such a claim would be absurd. Rather, Plaintiff's claim is based on the allegation that Pritchett assaulted Corkerin. This claim is alleged in paragraph 125 of the Complaint, which states "Defendants' actions violated 42 U.S.C. § 1983 in that the decedent, Mr. Corkerin, was deprived of his life, liberty or property without due process of law secured to him by the Fourteenth Amendment to the Constitution of the United States," and the factual basis is stated in paragraph 29, "On or about November 27, 2001, Defendant Pritchett, while an employee of the Department, on duty, murdered Ronald Corkerin by strangulation." *See Quality Foods v. Latin Am. Agribusiness Dev. Corp.*, 711 F.2d 989, 995 (11th Cir. 1983) (discussing liberal notice pleading rules). Because there is no allegation that the Complaint did not provide Pritchett with "fair notice" of the grounds upon which Plaintiff's claim rests, Pritchett's argument fails, and his motion on this issue must be denied.

### b.    Plaintiff's Argument in Support of Summary Judgment

Plaintiff has also moved for summary judgment against Pritchett on this claim; however, this motion must also be denied because there exist genuine issues of material fact. Viewing the evidence in the light most favorable to Pritchett, this Court believes there is sufficient evidence for a reasonable jury to conclude that Pritchett did not cause Corkerin's death. The record demonstrates that Corkerin was having medical problems on the day of

his death that were serious enough for Dr. Dozier to put him under constant observation. Moreover, no one witnessed Corkerin's death (except, perhaps, Pritchett), and there was a period of time during the constant observation when no one was watching Corkerin at all. Under these circumstances, drawing all reasonable inferences in Pritchett's favor, a reasonable jury could conclude that Corkerin's death was as a result of natural causes, an accident, or a third party.  As discussed in Part V.A.2, if Pritchett did not cause Corkerin's death, or if he did but was merely negligent, he can not be liable under § 1983.  Therefore, Pritchett has established that genuine issues of material fact exist, and Plaintiff's motion for summary judgment on this issue must be denied.

**B.     State Law Claims**

Plaintiff asserts several state law claims against Pritchett and Waters.  Counts I and II are assault claims against Pritchett; Count XIX claims that Pritchett was negligent, wanton, willful, malicious, fraudulent, or acting in bad faith, beyond his authority, and/or under a mistaken interpretation of the law in monitoring Corkerin.  Count VIII charges both Pritchett and Waters with failing to adequately notify Corkerin's family of his death.  Count XIV charges both Pritchett and Waters with failing to provide a safe and humane environment.  Counts III, IV, XI, XIII, and XV state various additional tort claims against Waters.

**1.     Rhonda Cade Waters**

**a.     Supplemental Jurisdiction**

Because this Court has dismissed the only federal claim against Waters, all claims

against her over which this Court has original jurisdiction have been dismissed.  Therefore, this Court has discretion to dismiss the state law claims against her.  28 U.S.C. § 1367(c)(3); *Crosby v. Paulk*, 187 F.3d 1339, 1352 (11th Cir. 1999).  In making this determination, this Court will "take into account concerns of comity, judicial economy, convenience, fairness, and the like."  *Crosby*, 187 F.3d at 1352 (quoting *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 257 (1st Cir. 1996)).  This decision is "pragmatic and case-specific" and in "an appropriate situation, a federal court may retain jurisdiction over state-law claims notwithstanding the early demise of all foundational federal claims."  *Roche*, 81 F.3d at 257.

This Court has determined that maintaining supplemental jurisdiction over the state law claims is the more appropriate action.  In *Roche*, the First Circuit upheld a district court's decision to retain supplemental jurisdiction after dismissing all of the federal claims where "[t]he litigation had matured well beyond its nascent stages, discovery had closed, the summary judgment record was complete, the federal and state claims were interconnected, and powerful interests in both judicial economy and fairness tugged in favor of retaining jurisdiction."  *Roche*, 81 F.3d at 257.  This case is well past the "nascent stages" of litigation—it was removed to this court more than three years ago and is just weeks away from trial.  Moreover, the claims against Waters are factually intertwined with the claims against Pritchett, over which this Court still has original jurisdiction.

### b. State-Agent Immunity

Waters has asserted the affirmative defense of State-agent immunity.  State-agent

immunity is an affirmative defense recognized by the State of Alabama that makes a state official immune from civil liability in his personal capacity when the official's actions within his scope of employment fall within a category of conduct recognized as immune.  *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000).  The categories of conduct recognized by *Cranman* as immune are as follows:

> (1) formulating plans, policies, or designs; or
> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
>> (a) making administrative adjudications;
>> (b) allocating resources;
>> (c) negotiating contracts;
>> (d) hiring, firing, transferring, assigning, or supervising personnel; or
>
> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
> (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

*Ex parte Cranman*, 792 So. 2d at 405.  However, even if the official's conduct falls within one of the above categories, he shall not be entitled to State-agent immunity if he "acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."  *Id.*  Although *Cranman* was a plurality decision, the restatement of law as it pertains to State-agent immunity set forth in *Cranman* was

subsequently adopted by the Alabama Supreme Court's decisions in *Ex parte Rizk*, 791 So. 2d 911 (Ala. 2000), and *Ex parte Butts*, 775 So. 2d 173 (Ala. 2000).

The State-agent immunity analysis follows a two-step process. In the first step, the burden is on the defendant to demonstrate that the claims against them arise from a function that would entitle them to immunity. *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003). If the defendant make such a showing, the burden shifts to the plaintiff to establish that the government official acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority. *Id.*

### i.    Counts alleging improper supervision of personnel

Count XI alleges that Waters "negligently or wantonly failed to properly or adequately monitor and supervise Defendant Pritchett." This claim falls squarely within one of the categories of immune conduct articulated in *Cranman*, namely "(2) exercising his or her judgment in the administration of a department or agency of government, including . . . (d) . . . supervising personnel." *Ex parte Cranman*, 792 So. 2d at 405. Therefore, the burden is on Plaintiff to show that Waters acted "willfully, maliciously, fraudulently, in bad faith, or beyond their authority." As discussed in Part V.A.2.b, Plaintiff has not presented *any* evidence that Waters' failure to supervise Pritchett amounted to anything more than simple negligence. Therefore, Waters motion for summary judgment is granted as to Count XI.

### ii.   Counts alleging improper monitoring of Corkerin

Counts IV, XIII, XIV, and XV all allege liability for Waters' failure to adequately

monitor Corkerin.[8]  Waters argues that her conduct fits under the second category identified

in *Cranman*, which provides a State-agent with immunity when he is "exercising his or her

judgment in the administration of a department or agency of government."   *Ex parte*

*Cranman*, 792 So. 2d at 405.  The Supreme Court of Alabama, however, has held that a nurse

implementing a doctor's orders who negligently allowed a patient to fall did not qualify for

State-agent immunity because she was not exercising the type of judgment contemplated by

*Cranman*.[9]  *See Ex parte Flynn*, 776 So. 2d 99, 101-02 (Ala. 2000); *see also Wilson v.*

*Manning*, 880 So. 2d 1101, 1109-10 (Ala. 2003) (denying State-agent immunity for nurse

when genuine issue of material fact existed as to whether her actions violated a statute); *Ex*

---

[8]  Count IV alleges that Waters "callously neglected to follow procedures. . . . As a proximate result, Ronald Corkerin was murdered."   Count XIII alleges that Waters "negligently or wantonly failed to properly or adequately monitor [Corkerin]."  Count XIV alleges that Waters "negligently or wantonly failed to provide a safe and humane environment to [Corkerin]."  Count XV alleges that Waters "negligently or wantonly allowed [Corkerin] to be abused, neglected, and murdered."

[9]  This Court believes that it is conceivable that Waters could qualify for State-agent immunity under the third category of immunity for "discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner."  *Ex parte Cranman*, 792 So. 2d at 405.  The record indicates that the reason she left the constant observation of Corkerin was because another patient demanded their medication immediately and threatened to not take their medication at all.  Because Waters could not observe Corkerin and administer the patient's medicine at the same time, Waters could have been subject to conflicting responsibilities.  Assuming that such a "catch-22" scenario existed, this Court would not see any reason why an official faced with such a dilemma should be disqualified from having immunity.  However, Waters has not provided this Court with any policies prescribing her obligations regarding the administration of medication to patients, and the burden of production is on her. *See Ex parte Trawick*, 959 So. 2d 51, 57-58 (Ala. 2006) (defendant claiming immunity under third *Cranman* category has the burden to produce a statute, rule, or regulation imposing a duty).

*parte Cranman*, 792 So. 2d at 406 (denying State-agent immunity for state-employed physicians with respect to treatment of patients). Therefore, this Court will deny Waters' motion for summary judgment as to these counts.

With respect to Plaintiff's motion for summary judgment on these counts, this Court has already determined that a genuine issue exists as to the cause and timing of Corkerin's death. Because this issue is material to the resolution of the claims against Waters as well, Plaintiff's Motion for Summary Judgment on these counts must also be denied.

### iii. Other Counts

Count VIII alleges that Waters was involved in the decision to tell Corkerin's family that he had committed suicide, which constituted an "attempt to cover up [Corkerin's] murder and/or aid and abet the cover up [of] the murder." This Court assumes, without deciding, that the decision to tell Corkerin's family that he had committed suicide does not fall under any of the categories of conduct identified in *Cranman* as immune. Under this assumption, Waters would not be entitled to State-agent immunity. Nevertheless, Plaintiff has not presented *any* evidence that Waters had any involvement in the decision to tell Corkerin's family that he had committed suicide, let alone that she participated in a "cover up." Under these circumstances, where the nonmovant has failed to present a prima facie case, Waters is entitled to summary judgment on this count. *See Kee v. National Reserve Life Ins. Co.*, 918 F.2d 1538, 1542-43 (11th Cir. 1990).

### 2.    Zerick Pritchett

Pritchett has not moved for summary judgment against any of the state law claims against him.  Plaintiff has moved for summary judgment against Pritchett on Counts I and II for the assault of Corkerin, Count VIII for failing to notify Corkerin's family with accurate results of the investigation, and Counts XIV and Count XIX, which related to Pritchett's alleged failure to monitor and protect Corkerin from harm.  However, as discussed previously, there are genuine issues of material fact as to the cause and timing of Corkerin's death.  This precludes summary judgment on the assault claims (I, II) because there is sufficient evidence for a reasonable trier of fact to conclude that Pritchett did not commit assault.  With regard to the failure to monitor claims (XIV, XIX), the evidence demonstrates that Pritchett was not responsible for monitoring Corkerin during the time he was escorting another patient to the laundry room, which a reasonable trier of fact could conclude was the time that Corkerin died.  Lastly, Plaintiff's motion with respect to Count VIII (failure to notify) must also be denied for the reasons articulated previously.  *See supra* Part V.B.1.a.iii.  Therefore, Plaintiff's Motion for Summary Judgment on her state law claims against Pritchett is due to be denied.

## VI.  CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

(1) Plaintiff's Motion for Summary Judgment (Doc. # 66) filed July 3, 2007, is DENIED.

(2) Defendant Zerick Pritchett's Motion for Summary Judgment (Doc. # 64) filed July 3, 2007 is DENIED.

(3) Defendant Rhonda Cade Waters' Motion for Summary Judgment (Doc. # 88) filed July 31, 2007 is GRANTED IN PART and DENIED IN PART.  It is ORDERED that the Motion is:

      (a) GRANTED with respect to Counts VIII, XI, XVIII; and

      (b) DENIED with respect to Counts IV, XIII, XIV, and XV.

DONE this 20th day of September, 2007.

                /s/ Mark E. Fuller
              CHIEF UNITED STATES DISTRICT JUDGE

27